# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| CHARLES M. HOLLIS, JR., and ) | |
| MELANIE HOLLIS, Individually ) | |
| and as Next Friends for H.H. ) | |
| and C.A.H., two minors, ) | |
| ) | **Case No. 3:12-cv-00137** |
| **Plaintiffs,** ) | **Hon. Aleta Trauger** |
| ) | |
| **v.** ) | **JURY DEMAND** |
| ) | |
| CHESTNUT BEND HOMEOWNERS' ) | |
| ASSOCIATION and WESTWOOD ) | |
| PROPERTY MANAGEMENT, LLC, ) | |
| ) | |
| **Defendants.** ) | |

---

## PLAINTIFFS' MEMORANDUM
## IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Charles and Melanie Hollis bring this action in their individual capacities and as next friends for their children, H.H. and C.A.H. against the Defendants Chestnut Bend Homeowners Association ("CBHOA") and Westwood Property Management ("Westwood") for violating the Fair Housing Act ("FHA") by refusing their requests to make reasonable modifications to their home in order to allow their disabled children to have equal opportunity to use and enjoy their home. Plaintiffs seek declaratory relief and also seek compensatory damages based on Defendants' deliberate and purposeful deprivation of Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 *et. seq.* Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants have moved for summary judgment. This Court should deny summary judgment because there are genuine disputes as to material facts and Defendants are not entitled to judgment as a matter of law.

<u>**STATEMENT OF FACTS**</u>

Charles and Melanie Hollis purchased their home at 410 Blake Baskin Court, Franklin, Tennessee ("the Property") in May of 2010. At the time, their daughter H.H. was only a year old and in need of several open-heart surgeries. Their sole motivation for purchasing this home was to be in close proximity to a full service hospital for their daughter and to live near a family they knew in this subdivision who could watch their other children in the event of an emergency. Charles Hollis Dep. 23:15-24:5. The Hollises have two children with disabilities, H.H., now age seven, and a son, C.A.H., now age four. Their daughter, H.H. was born with a complex congenital heart disease and Down syndrome, suffers from developmental delay and has undergone three open-heart surgeries. Their son, C.A.H. also has Down syndrome and Autism Spectrum Disorder and other physical impairments. Both children are non-verbal and require constant supervision and care.

Shortly after Plaintiffs moved into their new home, H.H. began to exhibit more severe behavioral problems. These took the form of frequent and sometimes violent outbursts during which "she would bang her head on the floor when she would become frustrated, even bruising her head, throw things and bang on windows and doors." M. Hollis Aff. ¶ 3. The Hollises consulted with their pediatric physical therapist and two of the children's physicians for advice on how to best deal with these behavioral issues. These medical care providers all agreed that some gross motor skills and sensory stimulation in a space where their daughter could expend energy that was intentional and directed in a positive manner would help alleviate her frustration and help her developmentally. M. Hollis Dep. 25:4-21; Aff. of Barbara Hargrove ¶ 9; Decl. of Dr. Norman Albertson ¶¶ 4 – 5; Aff. of Dr. Thomas Doyle ¶¶ 10 – 11.

Specifically, their pediatric cardiologist and their therapist confirmed to Plaintiffs that

H.H. would benefit from a particularized living environment that is therapeutically designed to stimulate her gross motor skills and development[1] and allow both disabled children to have full enjoyment of their home by providing sunlight exposure and sensory stimulation to aid in the children's development. M. Hollis Dep. 85:13-86:3.The addition would also serve as a physical therapy room where certain equipment could be stored and used as needed.

Thus, Plaintiffs decided to apply to the CBHOA for a modification of their home. Over the course of the year, from March to December 2011, the CBHOA and ARC denied four different applications and several appeals of Plaintiffs' proposed sunroom addition. Each time additional information was requested by either the CBHOA, the ARC, or Westwood, Plaintiffs complied. However, all of Plaintiffs' plans were rejected, their applications summarily denied.[2]

As a consequence of Defendants' unlawful actions, Plaintiffs have been deprived of the opportunity to make reasonable modifications to their home for the benefit of their children. Plaintiffs have been forced to find alternative housing in a community where they will not experience this discriminatory treatment.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). As this Court recently stated, at the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Hildebrand v. Dollar Gen.*

---

[1] While both children suffer from disabilities, they differ significantly in their behavior issues and developmental needs. Both children are non-verbal. Whereas H.H. may respond in an agitated manner to certain stimuli, their son, C.A.H., who is still not walking at age four and is unable to eat solid foods, withdraws into a "stimming" mode placing his hands over his face and withdrawing to a corner in the room. The new sunroom was designed to pull C.A.H. out with equipment and new sounds; for H.H. it was to provide a place to escape and move about. Melanie Hollis Dep. 26:10-27:10.
[2] A description of these various applications and the Defendants' responses to them is discussed in greater detail *infra* at 5-19.

*Corp.*, 3:11-CV-00554, 2013 WL 3761291 (M.D. Tenn. July 16, 2013). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party must meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

At this stage, "the judge's function is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Moldowan v. City of Warrent,* 578 F.3d 351, 374 (6th Cir. 2009). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Id..* An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan,* 578 F.3d at 374.

## ARGUMENT

### Reasonable Modifications Under the Fair Housing Act

Plaintiffs' numerous unsuccessful requests to add a sunroom to their home to provide for the needs of their two children with disabilities are properly categorized as requests for **reasonable modifications**. The Fair Housing Act makes it illegal to refuse

> to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises …

42 U.S.C. § 3604(f)(3)(A). The Fair Housing Act defines "handicap,"[3] in pertinent part, as

> (1)     a physical or mental impairment which substantially limits one or more of such person's major life activities,
> (2)     a record of having such an impairment, or
> (3)     being regarded as having such an impairment …[4]

42 U.S.C. § 3602(h).

---

[3] The Plaintiffs in this case use the word "disability" as a more modern, accepted synonym for the word "handicap" appearing in the Fair Housing Act.
[4] That C.A.H. and H.H. qualify as persons with disabilities does not appear to be in dispute for purposes of Defendants' Motion for Summary Judgment.

4

To establish a *prima facie* case of failure to allow a reasonable modification under 42

U.S.C. § 3604(f)(3)(A):

> … [a] complaining tenant has to show that she sought the landlord's permission to modify the premises to accommodate her disability at no expense to the landlord, and (1) that the tenant is a person with a "handicap" as that term is defined in section 3602(h) of the FHA; (2) that respondents knew or should have known that the tenant had a handicap; (3) that reasonable modifications may be necessary to afford the tenant full enjoyment of the premises (i.e., to have entry and egress from the apartment without significant difficulty); and (4) that respondents refused to permit such reasonable modifications.[5]

*HUD v. Twinbrook Village Apts.*, HUDALJ 02-00-0256-8 (*available at* http://portal.hud.gov/hudportal/documents/huddoc?id=HUD2002-00-0256-8.pdf), citing *Shapiro v. Cadman Towers, Inc.*, 51 F. 3d 328, 335 (2d Cir. 1995); *United States v. California Mobile Home Park Management Co.*, 107 F. 3d 1374, 1380 (9th Cir. 1997).

### I. Defendant CBHOA Refused on More Than One Occasion to Allow the Requested Modifications

In their Memorandum of Law in Support of Motion for Summary Judgment, Defendants have focused almost solely on a single request Plaintiffs made for a reasonable modification, one submitted on Plaintiffs' behalf by attorney Tracey McCartney in December 2011, which Defendants concede "was complete and provided all necessary supporting documents and materials." (Defs.' Statement of Undisputed Material Facts ("SOF") ¶19) However, Plaintiffs actually made at least three previous requests, which Defendants unequivocally refused. In the course of refusing those requests, Defendants also continually moved the goalposts, first saying a sunroom with a shingled roof and stone "worked up the sides" would be accepted, then saying they wanted brick instead of matching siding, then denying the Plaintiffs' request to simply duplicate another sunroom that Defendants had previously approved and was already in the

---

[5] Animus against people with disabilities is not one of the elements.

neighborhood. The ARC response to Plaintiffs' final request was to refuse it because it had a metal roof, even though CBHOA told Plaintiffs that a metal roof would be acceptable.

**REQUEST 1 – The "Conservatory" Design, March 15, 2011 to May 26, 2011**

On March 15, 2011, Melanie Hollis sent an e-mail to Debbie Panaia, a member of the ARC, telling Panaia that Plaintiffs wished to add a sunroom to the rear of their home. McCartney Aff. Ex. 15. On March 16, 2011, Plaintiffs left an "APPLICATION FOR FENCE/ STRUCTURE/EXTERIOR CHANGE" in Panaia's mailbox. Melanie Hollis Dep. 53:25-54:4 The application sat dormant for two weeks and was eventually stamped as "received" on April 4, 2011. McCartney Aff. Ex. 66. The proposal was for a "conservatory"-style sunroom that would be primarily constructed of metal and glass in a way that would let in the maximum amount of light. McCartney Aff. Ex. 67. In the weeks following, the members of the ARC had several e-mails back and forth, some of which expressed their dislike of the proposed sunroom design. McCartney Aff. Ex. 16. At the suggestion of ARC members, M.J. Turner, the property manager at Chestnut Bend and an agent of Defendant Westwood Management, submitted the proposal, along with photos Mrs. Hollis provided, to the CBHOA Board of Directors. The Board apparently related to Turner that "metal sunroom and no specifics is not enough info." McCartney Aff. Ex. 17. On or about April 15, 2011, Turner sent an e-mail to Plaintiffs informing them that "the ARC has reviewed your sunroom application and are not on board with the metal framework." McCartney Aff. Ex.18. Turner sent a letter to Plaintiffs dated April 18, 2011, in which she asked for more information, including a plot plan, and said that the "[s]unroom addition should match the materials of the existing house (brick, trim, shingles and paint colors)." McCartney Aff. Ex. 19.

On April 19, 2011, Mrs. Hollis sent an e-mail to Turner and members of the ARC in

which she stated that

> the metal framework simply brings the sunshine and outdoors into the room more than wooden beams would allow, and **our primary desire is to create a year-round, heated and cooled, outdoor room for our two little ones with Down syndrome who don't get to enjoy the outdoors as often as they would like**.

McCartney Aff. Ex. 20 (emphasis added). Plaintiffs subsequently gave permission for the ARC to meet with Rick Jaggers, their contractor. On April 25, 2011, Jaggers hand-delivered a packet of information to Turner that included photos, dimensions and drawings. McCartney Aff. Ex. 21. The ARC deliberated via e-mail, again expressing dislike of the aesthetics: "I do not believe that the look, according to the computer model provided by the builder, is acceptable for the neighborhood," McCartney Aff. Ex. 22, and "My initial concerns still stand. Do not like glass roof. Want roof to match house roof. Want to attach like an extension of the roof. Do not like 'rock veneer' walls… My vote is do not approve." McCartney Aff. Ex. 23.

On April 27, 2011, Turner wrote a letter to Plaintiffs relating that the ARC had "denied your request for approval." Among the reasons cited:

- "The ARC feels that the roof of the sunroom should match the same materials/shingles as the existing house"
- "The photos submitted look as though the sunroom is tacked onto the existing house and not an addition to the house."
- "They feel the sunroom, as submitted, will detract from the look of the Neighborhood standards."

McCartney Aff. Ex. 2. Plaintiffs appealed the decision, and the full CBHOA Board met with Plaintiffs and Jaggers on May 19, 2011. McCartney Aff. Ex. 24. On May 26, 2011, Turner sent a letter to Plaintiffs again denying approval for the sunroom because the Board wanted, in addition to a shingled roof, "stone worked up the sides" and skylights. McCartney Aff. Ex. 25.

With respect to **Request 1**, Plaintiffs will be able to carry their burden on all the elements establishing that Defendants refused the request to make a reasonable modification to the home.

It is undisputed that Plaintiffs sought the "landlord's" (here, the ARC's and Board of Directors') permission to modify their home by submitting an application form on March 16, 2011. Defs.' Statement of Undisputed Facts ¶ 8. In fact, Turner told Mrs. Hollis in a May 10, 2011 e-mail that the application packet was complete as of April 12, 2011. McCartney Aff. Ex. 26. Further, it is undisputed for purposes of Defendants' motion that minor children H.H. and C.A.H. have disabilities as defined at 42 U.S.C. § 3602(h) of the FHA. Third, Defendants knew that the children have disabilities and that the sunroom was intended for their benefit as early as April 19, 2011, as evidenced by Mrs. Hollis's e-mail of that date. McCartney Aff. Ex. 20. Fourth, it was necessary for Plaintiffs to have additional space for H.H. and C.A.H. to play and receive physical therapy in order to have full enjoyment of the premises. Hargrove Aff. ¶7; McCartney Aff. Ex. 5. Finally, Defendants refused Plaintiffs' Request 1 on aesthetic grounds.

Thus, with respect to Request 1, a reasonable jury would be able to find that the request for reasonable modification was refused by the Chestnut Bend ARC.

**REQUEST 2 – Shingled Roof with Matching Siding, August 8, 2011 to August 29, 2011**

On August 8, 2011, Mrs. Hollis submitted a second "APPLICATION FOR FENCE/STRUCTURE/EXTERIOR CHANGE" to Turner. The proposal was for a sunroom that would have a roof with matching shingles and siding that would match the existing siding on Plaintiffs' house. McCartney Aff. Exs. 27, 3, 5. As Mrs. Hollis told Turner, "Every aspect of the sunroom will be in line with the current style and color-scheme of our home." McCartney Aff. Ex. 5.

On August 9, 2011, the three members of the ARC exchanged e-mails about the new request. Deborah Panaia and Bill Rosin voted via e-mail to approve the proposal. McCartney Aff. Ex. 28. Andrea Repass requested to see a picture or sketch. She also stated she "would

prefer brick" and expressed concern that siding on an entire addition may not be "allowed." McCartney Aff. Ex. 29. Later that evening, Repass sent another e-mail asking if siding is acceptable and asking if the application calls for a rendering of the proposed sunroom. McCartney Aff. Ex. 30.

On August 10, 2011, Turner e-mailed the three members of the ARC and stated that the application form requests front and side view elevations with dimensions, plot plans, a sample Board of materials to be used, and color samples of paints and stains. Turner stated that Plaintiffs had submitted a hand-drawing of the plot plan and "some details" regarding materials, colors, and dimensions. Turner asked the ARC if they had enough information to make a decision or if she needed to request drawings of front and side elevations or any other information. McCartney Aff. Ex. 31. Repass responded that she wanted to see a drawing. She also reiterated her concern about the proposed sunroom having siding rather than brick. McCartney Aff. Ex. 32. Turner then e-mailed Mrs. Hollis and asked for a rendering of the front and side elevations to the proposed sunroom.

On August 11, 2011, Plaintiffs hand-delivered a rendering, McCartney Aff. Exs. 6, 7. which Turner forwarded to the ARC that same day. Panaia again voted to approve the project. McCartney Aff. Ex. 33.

On August 12, 2011, Repass e-mailed the ARC and Turner and stated that "**With what they have submitted**, **if they will change the exterior to brick, we will approve it**." McCartney Aff. Ex. 34 (emphasis added). It is clear that, as of this point, the ARC felt it had all of the information it needed to make an informed decision and was simply basing its denial on aesthetics alone, *i.e*., the proposed use of siding rather than brick. On August 16, 2011, Turner told Plaintiffs that the ARC wanted a brick sunroom rather than a siding sunroom. McCartney

9

Aff. Ex. 35. Melanie Hollis responded that the brick from their home is no longer made and cannot be matched. McCartney Aff. Ex. 36. On August 19, 2011, Repass e-mailed Turner and stated that the ARC was deferring their decision to the Board because the ARC was not comfortable making the exception of allowing an all-siding sunroom. McCartney Aff. Ex. 37.

Also on August 19, 2011, Turner e-mailed Mrs. Hollis and asked if Plaintiffs' contractor could meet with the Board. Turner also asked if they could switch their request one involving from siding to one "incorporating a stone exterior." Turner also asked that Mrs. Hollis contact the Register of Deeds office to obtain and provide a copy of Plaintiffs' plot plan.[6] Turner also requested a professional drawing of the elevations and dimensions and a sample of all proposed materials. McCartney Aff. Ex. 38.[7] Melanie Hollis responded that stone was too cost prohibitive for the exterior and that there would be shrubs along the outside wall, which would cover up the expensive stone anyway. Melanie Hollis also stated that she would provide an official plot plan, architectural rendering, and sample materials if every other homeowner who requested a sunroom had to provide that same information. McCartney Aff. Ex. 39.

On August 21, 2011, Board member Tiffany Bechtel wrote an e-mail to Turner and the Board that she did not think the Board was being unreasonable in asking Plaintiffs for further detailed information. McCartney Aff. Ex. 40. Board president Mike Vaughn agreed with Bechtel. McCartney Aff. Ex. 41. On August 24, 2011 Vaughn reiterated this position in an e-mail to Turner, the Board, and the ARC. Vaughn stated, "[The Hollises] should do what ARC has already asked them to do, submit some kind of drawing, sketc [sic], somewhat to scale, site

---

[6] This request came despite the fact that on August 10, 2011, Turner e-mailed the ARC and stated that Melanie Hollis had submitted a hand-drawing of the plot plan. McCartney Aff. Ex. 32. Additionally, no ARC member ever expressed the need for a plot plan in order to make a decision.

[7] Again, this is in direct conflict with Turner's August 10, 2011 e-mail where she stated that Plaintiffs had provided details in e-mails regarding materials, colors, and dimensions. McCartney Aff. Ex. 31. Mrs. Hollis had also previously provided a rendering of the elevations and dimensions. McCartney Aff. Ex. 7.

layout, and list of building materials." McCartney Aff. Ex. 42.

On August 29, 2011, Turner wrote a letter to Plaintiffs relating that the ARC and Board "were not able to approve your application as submitted." Turner asked that Plaintiffs resubmit the application with a plot plan, renderings with elevations and dimensions, samples or photos of all materials to be used, name and contact information of the contractor, and a landscape plan around the proposed sunroom. McCartney Aff. Ex. 1.

Even though two of the three ARC members were very easily able to initially express approval of Plaintiffs' second request[8] and all three ARC members were very easily able to approve the request if the exterior were changed from siding to brick,[9] Turner incredibly maintains that this request was incomplete. Turner Aff. ¶15

With respect to **Request 2**, Plaintiffs will be able to prove at trial all the elements establishing that the Defendants refused the request to make a reasonable modification to the home. Much like Request 1, Defendants have attempted to demonstrate through their Statement of Undisputed Facts and in their Memorandum of Law that Request 2 was not complete. And much like Request 1, whether the submission met all the formal requirements of the ARC **is not material**. The ARC agreed to accept additional information from Plaintiffs regarding Request 2 and then ultimately refused the request on **aesthetic grounds.**

Thus, with respect to Request 2, a jury would be able to find that the request for reasonable modification was refused by the Chestnut Bend ARC and Board.

**REQUEST 3 – The Clay Morgan Design, September 13-14, 2011**

After the ARC refused Request 2, Mrs. Hollis began looking at existing sunrooms in the Chestnut Bend neighborhood that had previously received approval from the ARC. Melanie

---

[8] Panaia and Rosin expressed approval of the request on August 9, 2011. McCartney Aff. Exs. 8, 28.
[9] Repass stated in an August 12, 2011 e-mail, "With what they have submitted, if they will change the exterior to brick, we will approve it." McCartney Aff. Ex. 34.

Hollis Aff. ¶11. She saw her neighbor Clay Morgan's sunroom and believed it would meet their needs. McCartney Aff. Ex. 43.

On September 13, 2011, Mrs. Hollis wrote an e-mail to Turner, the ARC, and the Board asking for approval for an exact replica of Morgan's sunroom. Mrs. Hollis asked that she be permitted to use a brown metal roof (unlike Morgan's red metal roof) but stated she would consider a red metal roof if the Board preferred, "just to get this thing done." Mrs. Hollis included in the e-mail the dimensions of the proposed sunroom and the name and phone number of her contractor. *Id*. Later that day, Plaintiffs hand-delivered the "APPLICATION FOR FENCE/STRUCTURE/EXTERIOR CHANGE" to Turner. McCartney Aff. Ex. 44.

On September 14, 2011, Turner denied the request and wrote on the request form, "Incomplete submission – no supporting and required info. rendered." *Id*. On September 15, 2011, Turner wrote a letter to Plaintiffs stating that the ARC was unable to approve the request because it was incomplete and did not include elevations, dimensions, location and depth of any cuts in the soil, location of utilities or drainage courses, or a plot plan. McCartney Aff. Ex. 45.

On September 20, 2011, Mrs. Hollis e-mailed Turner, the Board, and the ARC. She stated that her intent with this request was to modify other requests and not to begin a brand-new application process. Mrs. Hollis stated that it had been her understanding that the ARC's and Board's issues with previous requests were based on aesthetics alone, yet the recent denial seemed to be utilitarian and based on drainage and setback concerns. Mrs. Hollis further stated that she assumed the aesthetics of the new request were suitable since they were not mentioned. Mrs. Hollis attached a plot plan to the e-mail, stated the design would not impede drainage, stated she had already given the measurements, and added that she did not feel the need to turn in pictures since the design was an exact replica of Morgan's. McCartney Aff. Ex. 46.

Her last e-mail unanswered, Mrs. Hollis wrote another e-mail to Turner, the Board, and the ARC on September 29, 2011. In this e-mail, she went into detail about what types of equipment would be in the completed sunroom. She explained how H.H. bangs her head on the floor repeatedly when she feels frustrated about not being able to go outside and how the sunroom would be an indoor play area that simulated the outside world. Mrs. Hollis stated in this e-mail that the ARC and Board "creatively continue to add to the list of items we have to check off before an approval 'might' be given…" McCartney Aff. Ex. 47.

On September 30, 2011, the Board discussed Plaintiffs' latest request at a Board meeting. According to handwritten notes by Turner, "The ARC nor Board base any decisions re: ARC appl. on intended use but rather on the structure being proposed and complete presentation of materials." McCartney Aff. Ex. 48.

Having still not received an answer to her September 20 or September 29, 2011 e-mails, Mrs. Hollis again e-mailed Turner, the Board, and the ARC on October 7, 2011 asking for a response. McCartney Aff. Ex. 49.

On October 10, 2011, Mrs. Hollis e-mailed Turner, the Board, and the ARC a picture of Morgan's sunroom and reiterated that her proposal is to replicate that sunroom but with a brown metal roof with the dimensions she already provided. McCartney Aff. Ex. 50. On that same day, Turner wrote a letter to Plaintiffs requesting a meeting among them, their contractor, and the Board "once [Plaintiffs] have put together all of the requested information noted in all letters to you regarding your sunroom submissions and on the ARC Application." McCartney Aff. Ex. 51.

On October 11, 2011, Turner forwarded Mrs. Hollis's October 10, 2011 e-mail to the Board and stated that it was not a complete application and did not include, among other things, the contractor's name, materials to be used and colors of those materials, or a plot plan.

McCartney Aff. Ex. 52. This is despite the fact that Mrs. Hollis had already submitted her contractor's name and phone number, plot plan, and a very obvious answer to the materials and colors to be used ("a replica with a brown metal roof"). On October 11, 2011, Turner sent a letter to Plaintiffs stating she had received the photos of Morgan's sunroom. Turner stated, "Your submission of this photo with no other information can not [sic] be processed as a complete ARC Application for approval." McCartney Aff. Ex. 53.

On October 12, 2011, Mrs. Hollis sent an e-mail to Turner, the Board, and the ARC reiterating the purpose for the sunroom and stating she has turned in every single required item in order to gain approval for a sunroom. Melanie Hollis included a quote from the Fair Housing Act regarding reasonable accommodations and quoted letters from H.H. and C.A.H.'s doctors that had been given to Turner. McCartney Aff. Ex. 54.

With respect to **Request 3**, Plaintiffs will be able to carry their burden on all the elements establishing that Defendants refused the request to make a reasonable modification to the home. In fact, the ARC refused to even **consider** the request because Plaintiffs did not provide anew the same information (plot plan, etc.) she had provided previously and because she did not use the ARC's application form. McCartney Aff. Ex. 51. The ARC had all the information it needed to make a decision but chose not to. "…[H]ousing providers must give appropriate consideration to reasonable modification requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests." *Joint Statement of the Department of Housing and Urban Development and the Department of Justice: Reasonable Modifications Under the Fair Housing Act* ¶15 ("*Joint Statement*"), available at http://www.hud.gov/offices/fheo/disabilities/reasonable_modifications_mar08.pdf.

Thus, with respect to Request 3, a reasonable jury would be able to find that the request

for reasonable modification was refused by the Chestnut Bend ARC and Board.

**REQUEST 4 – The Application Submitted by Tracey McCartney, December 6, 2011**

On December 6, 2011, Tracey McCartney of the Tennessee Fair Housing Council submitted Plaintiffs' fourth application for approval to Defendants. McCartney Aff. Ex. 55. She copied the submission to Robert Notestine and included a two-page letter to him outlining the legal issues she felt were applicable and copies of letters from physical therapist Barbara Hargrove and pediatrician Norman Albertson documenting the children's need for therapy space. McCartney Aff. Ex. 68. The ARC and Board members were still reluctant to approve Plaintiffs' request unless certain additional conditions were added:

> ***Andrea Repass***: My recommendation is to approve the submission with one change and one clarification. First, I would like to see a shingled roof. Second, I would like clarification that the structure is to house the exercise equipment they desire and not that we will be getting a submission for an exception to neighborhood standards for the equipment to be outside. McCartney Aff. Ex. 56.

> ***Bill Rosin***: I completely agree with you, Andrea. My recommendation is to ask for a shingled roof to be consistent with the architectural standards of the neighborhood and the clarification regarding the exercise equipment as Andrea stated. McCartney Aff. Ex. 57.

> ***Erick Nash***: I agree with David and Andrea pending legal guidance. McCartney Aff. Ex. 58.

> ***David Bradley***: I agree with Andrea's suggestion as long as Westwood feels that it will not compromise our position with the Fair Housing Dept. *Id.*

> ***Lisa Thomas***: I agree that metal roofing should be rethought for shingles. All else looks good and very thorough… hooray! McCartney Aff. Ex. 59.

> ***Mike Vaughn***: I suggest we accept the application after we request they replace the metal roof with a shingle roof, pointing out that the CBHOA would not have approved the metal roof (insert history), and the CBHOA would like to set the standard for the future to require matching shingle roofs. If we approve a metal roof design, there will be two approved metal roofs for sunrooms in the neighborhood and thus the standard would be metal roofs. Others additions [sic] in the neighborhood would have used shingle roofing so if it is possible, will you consider a shingle roof? / Then, when we get there [sic] decision, we can approve it but I would rather set the

standard higher, rather than use the Morgan sunroom metal roof as the standard. McCartney Aff. Ex. 60.

After she received these Responses, Turner e-mailed them onto CBHOA's attorney, Robert Notestine, with the following message:

> Bob, attached are all of the responses from ARC Members and Board Members regarding the Hollis' sunroom application. Please respond to Tracey McCartney in letter and send me a copy. Please be sure they are not setting themselves up for legal action by making these requests. MJ

McCartney Aff. Ex. 61.

On December 13, 2011, the CBHOA Board met to consider Plaintiffs' fourth application. Rather than approve it, they added two additional conditions: 1) that Plaintiffs use a shingled roof and 2) that they agree to maintain all play or exercise equipment inside.

On December 15, 2011, Notestine sent a letter, the language of which was partially dictated and then approved by the Board (McCartney Aff. Ex. 62) to Tracey McCartney in which he stated:

> The ARC of the Association has reviewed the most recent submission by your clients and **generally** found it to be acceptable. There are two questions and/or concerns as follows:
>
> 1. The subdivision standard roof is shingle and not metal. Although metal roofs are in vogue right now the ARC prefers not to approve a metal roof. The reason is that there is some feeling that approval of a metal roof could create a new standard or at least would cause confusion about the shingle roof preference. While we recognize the Morgan sunroom addition has a metal roof, this structure was built before the Chestnut Bend ARC guidelines were established. The ARC's preference for all structures in Chestnut Bend is to have a shingle roof that matches the house.
>
> 2. **As part of the approval process**, the ARC would like some assurance in writing that the exercise equipment would be placed and maintained in the sunroom and not moved outside without further application to the ARC. **This would be a condition of approval**.

The letter also said that if these conditions were met, "**I suspect that approval will**

**be forthcoming**." Robert Notestine Dep. Ex. 15 (emphasis added).

McCartney responded to Notestine's letter on December 15, 2011, urging his client to honor the October 31, 2011 letter from Turner:

> If this cannot be resolved, the ARC is going to have some difficulty explaining to a finder of fact 1) why it allowed a metal roof for one resident but not another, and 2) why it said as recently as 6 weeks ago that a metal roof was acceptable but not but now won't accept it.

Robert Notestine Dep. Ex. 16.

On December 16, 2011, after conferring with Plaintiffs, McCartney sent a follow up letter to Notestine in which she stated as follows:

> I have had an opportunity to speak with my clients about your letter of yesterday. The Hollises wish to move forward with a metal roof, which was among the roof types listed as acceptable to the ARC in M.J. Turner's October 31, 2011 letter to you. . . . The Hollises also prefer metal for the sensory stimulation it can provide, which is important for the development of their two children with Down Syndrome.
>
> We ask that you communicate with us by the close of business on Thursday, December 22, 2011, that the ARC consents to the design as submitted, metal roof included, or the Hollises will proceed accordingly with available legal options.

Notestine failed to respond to McCartney's letter by the December 22, 2011 date as requested. In his deposition, Notestine could not say definitively that there had been a "meeting of the minds" between the CBHOA and Plaintiffs regarding their fourth application:

> Q: From a purely legal standpoint, had there been a meeting of the minds of the parties by the end of December?
> A: Well, it's funny. That's a good question. For some reason, I thought there has been. It's not a legal opinion, but I had the distinct impression that the Board basically approved this, and the building was going to be built. Now, I don't know what to base that on other than in January that's what I thought – I had asked – at some point I had asked MJ, I said, Did they start building the building yet, or building the room on? And she said no. And then we get a lawsuit.

Robert Notestine Dep. 71:18-72:6.

The Plaintiffs likewise believed that the parties never reached an agreement on their fourth application. As Mr. Hollis testified in his deposition, it is the policy and practice of the

CBHOA to indicate in writing at the bottom of a homeowner's application for a modification whether the application is "Approved" or "Denied." At no time have Plaintiffs ever received back from the ARC or the CBHOA an application that states in writing it is "Approved".

> Q: Okay. Alright. So you did know or at least considered in December of 2011 that that was a rejection of your application?
> A: What we saw -- the response from the Board that we saw was a condition -- either a -- I don't know how in legal terms -- either a conditional offer or as a counter offer. Because it said as a condition of approval, you've got to get us this letter. You got to say that you'll keep the exercise equipment up.

Charles Hollis Dep. 101:22-102:6.

Defendants claim that they did not refuse Plaintiffs' requested accommodation because "once a complete application, including all of the required support, was submitted, it was approved within seven (7) days." Defendants' MSJ p.10. However, defendants *never* gave full approval to the application that Plaintiffs submitted on December 6, 2011. Rather, on December 15, 2011, the ARC stated in a letter, "ARC prefers not to approve a metal roof… ARC would like some assurance in writing that [exercise equipment not moved outside]…This would be a condition of approval…Advise if your client would agree to the above two requests by the ARC." McCartney Aff. Ex. 63. Clearly, Defendants did not approve Plaintiffs' December 6 application as submitted, because they added additional requirements as conditions of approval.

Defendants argue that, during this 9-month period of time, there was no "constructive denial" of the modification requests (Defendants characterize the December request as a request for "reasonable accommodation, which will be discussed further below) because the Plaintiffs remained in their home. Defendant's Memorandum of Law in Support of Motion for Summary Judgment 10. Defendants cite *Overlook Mutual Homes, Inc. v. Spencer, et al.*, 415 F. App'x 617 (6th Circ. 2011) for this proposition, but the Overlook case is factually distinguishable. In that case, the residents of the home (the Defendants) requested an exception to the housing providers "no-pets" policy so that their daughter, who had an anxiety disorder, could keep a dog that the

Spencers alleged alleviated the daughter's symptoms. Overlook at 618. During the entire length of the Spencers' dealings with their housing provider over the dog, the dog remained in the home, and "[t]hus, Overlook's actions did not deny the Spencers the benefit of Scooby's company." Id. at 623.

In the case at bar, however, the Plaintiffs have not had the benefit of the modification they requested. They remained in their home, patiently pursuing the reasonable accommodation process and coping as best they could with the children's behavioral difficulties, until it became clear in late December that permission to modify their home would not be forthcoming and they felt "forced out of the home." C. Hollis Dep. 25:6. They moved without ever building it and found a home that better suited their needs, and the move caused great emotional upheaval for H.H. and C.A.H. (C. Hollis Dep. 69:24)

## II. "Reasonableness" is Not a Dispositive Element to Plaintiffs' Claims

Defendants in this case have chosen to frame Plaintiffs' final request in December 2011 for a sunroom addition as a request for a reasonable **accommodation**, refusal of which has similar but not identical elements to requests for reasonable **modification.**[10] However, as stated above, that request and all the others are more properly analyzed as requests for modifications, because they were for "a structural change made to existing premises, occupied or to be occupied by a person with a disability, in order to afford such person full enjoyment of the premises." *See Joint Statement* ¶ 2.

As such, Defendants' argument that Plaintiffs' December request for a sunroom with a

---

[10] Both concepts are derived from regulations and case law interpreting Section 504 of the Rehabilitation Act of 1973 (29 U.S.C.A. § 794); *see* Preamble II, 54 Fed. Reg. 3249 (Jan. 23, 1989) (citing § 504 authorities). Section 504 does not make a distinction between "modifications" and "accommodations," because it applies to recipients of federal financial assistance which, in the housing context, are required to bear the cost of both accommodations and physical modifications as long as there is no undue financial burden. The concepts are separate under the Fair Housing Act; under the Act, the person living in the unit bears the financial responsibility for modifications to it.

metal roof was not "reasonable," and Defendants' preference for a shingled roof was "reasonable," is inapposite, because "reasonableness" is not an element when proving that a defendant failed to allow a reasonable modification.

However, assuming *arguendo* that the CBHOA's refusal to allow Plaintiffs to have a sunroom designed as Plaintiffs and their children's health care providers saw fit rather than designed by a committee of people seeking to impose their own arbitrary and capricious aesthetic judgments could be characterized as a refusal to grant a reasonable **accommodation**, Plaintiffs still can meet their burden to prove all those elements.

The Fair Housing Act makes unlawful "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604 (f)(3)(B). In this case, Defendants' normal "practice" or "policy" was to substitute their own aesthetic preferences for that of the homeowner.

To prevail on a claim of unlawful failure to make a reasonable accommodation, the plaintiff must prove that (1) the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) the defendant knew or should reasonably be expected to know of the handicap; (3) accommodation of the handicap is necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) defendant refused to make the requested accommodation. *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 855 (S.D. Ohio 2009), *citing Dubois v. Ass'n of Apt. Owners*, 453 F.3d 1175 (9th Cir. 2006).

In the reasonable accommodation context, "the concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled

plaintiff's quality of life by ameliorating the effects of the disability." *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995). "An accommodation is reasonable when it imposes no 'fundamental alteration in the nature of a program' or 'undue financial and administrative burdens.'" *Groner v. Golden Gate Gardens Apts.*, 250 F.3d 1039, 1044 (6th Cir. 2001).

As set out above, Plaintiffs can meet their burden on all the elements of Defendants' failure to allow Plaintiffs to make a modification to their home. Further, as to the additional element of reasonableness required to show a failure to make reasonable accommodations, Plaintiffs will be able to prove at trial that the sunroom design Plaintiffs proposed in December 2011 would not have imposed a "fundamental alteration to the nature" of Defendants' operation or posed an "undue financial or administrative burden."

Defendants ask the Court to hold that Plaintiffs' wish to have a metal roof was unreasonable as a matter of law. However, metal was among the acceptable materials listed in Turner's October 31, 2011, letter to Bob Notestine: "…i.e. roofing that is architecturally consistent with the neighborhood and/or aesthetically appealing **which may be metal roofing**…" McCartney Aff. Ex. 64. Further, the "CHESTNUT BEND HOMEOWNERS ASSOCIATION ARCHITECTURAL REVIEW GUIDELINES" include metal as an acceptable material for sunroom roofing. McCartney Aff. Ex. 65. Finally, another sunroom in the neighborhood already had a metal roof, so Plaintiffs' sunroom would have provided further uniformity. It is difficult to imagine how a metal roof could be considered an unreasonable feature of the requested sunroom under these facts.

Additionally, courts have held that aesthetics are not a valid reason to reject an accommodation of this type and do not make a requested accommodation unreasonable.

> The City argued that the fence would serve as a 'fundamental alteration' to the aesthetic character of the neighborhood and would affect property values. This Court

does not find concerns for aesthetics and property values to be viable reasons for potentially violating a handicapped individual's rights under the FHAA.

*Howard v. City of Beavercreek*, 108 F. Supp. 2d 866, 872 (S.D. Ohio 2), *citing*, e.g., *Larkin v. Michigan*, 883 F. Supp. 172, 177 n.2 (E.D. Mich. 1994) (finding under a FHA claim that "property values are often concerns as well, but . . . not a legal basis for such restrictions.").

The court in *Howard*, viewing the facts in a light most favorable to the plaintiff, held that the requested accommodation (a fence built taller than the town's zoning limit) could be found to be reasonable. *See also HUD v. Twinbrook Village*, *supra*: "In this case, concern for the appearance of the apartment complex does not constitute a legitimate basis to refuse to grant the accommodation."

Finally, Plaintiffs' unwillingness to spend as much money as necessary to please Defendants does not make Plaintiffs' sunroom proposal unreasonable as a matter of law. The proposal Plaintiffs submitted via their attorney in December 2011 had two benefits: The metal roof would provide needed sensory stimulation, Charles Hollis Dep. 43:16-18, and it would be more economical to construct than the all-brick or stone construction the ARC had wanted – construction that would not have met the children's needs as well as the design Plaintiffs proposed. McCartney Aff. Ex. 43. The family chose the designs they and their children's health care providers felt would benefit the children the most.[11]

### III. Westwood was More Than an Agent of the CBHOA Board

This issue is now MOOT. The parties have agreed to a non-monetary settlement with respect to Westwood and will file a separate Agreed Consent Order for the Court's approval and an Agreed Stipulation of Dismissal.

---

[11] "If the housing provider wishes a modification to be made with more costly materials, in order to satisfy the landlord's aesthetic standards, the tenant must agree only if the housing provider pays those additional costs." *Joint Statement* ¶20.

## IV. Plaintiffs Have Suffered Recoverable Damages

The Fair Housing Act prohibits discriminatory housing practices against persons with disabilities. *Preferred Properties, Inc. v. Indian River Estates, Inc.,* 276 F.3d 790, 800 (6th Cir. 2002). In their Memorandum of Law in Support of Motion for Summary Judgment, Defendants claim that Plaintiffs have suffered no recoverable damages. Defendants' MSJ at 17. However, "relief for discriminatory housing practices requires only that a seller be engaged in unlawful discrimination." *Preferred Properties*, 276 F.3d at 800.

It is well-settled that when a defendant violates the FHA, "compensatory damages may be awarded under the FHA for emotional distress, humiliation, embarrassment, mental anguish, and out-of-pocket losses caused by a defendant's discriminatory housing practices." U*.S. v. Matsuoff Rental Co.*, 494 F. Supp.2d 740, 749 (S.D. Oh. 2007). Once an FHA violation is established, "then [plaintiffs] need to prove only that they suffered a non-quantifiable injury at the hands of the defendants to justify an award of nominal damages." *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 237 (6th Cir. 2003).

Defendants also argue that emotional injury in this case must be established by medical or scientific proof. Defendants' MSJ at 18. Defendants cite *Ramsey v. Beavers*, 931 S.W. 2d527 (Tenn. 1996), a Tennessee state court case. However, a plaintiff seeking recovery for an FHA violation in federal court need not provide medical or scientific proof. *Byrd v. Brandenburg*, 932 F. Supp. 198, 201 (N.D. Oh. 1996). In *Byrd*, the court made clear that a "plaintiff who seeks damages for emotional distress caused by the violation of the Fair Housing Act need not submit medical or any other similar evidence of that emotional distress, nor must those damages be amendable to precise calculation." *Id.* After an FHA violation is established, plaintiffs need not provide medical or scientific proof of emotional distress because "emotional suffering, which

cannot be calculated with mathematical precision, constitutes a major component of the harm experienced by those victims for which compensation has been sought." *Matsuoff*, 494 F.Supp.2d at 749.

Defendants contributed to each of the following items of economic damage by violating the FHA and failing to allow Plaintiffs to make reasonable modifications to their home in order to accommodate the needs of their minor disabled children. Defendants' refusal to allow reasonable accommodations forced Plaintiffs to seek alternate housing that would meet their needs and would not be governed by Defendants and their agents. Plaintiffs seek recovery for the following damages:

1) Cost of improvement to property at Plaintiffs' home at 410 Blake Baskin Court, Franklin Tennessee, 37064[12];
2) Moving expenses in the approximate amount of $1,641.04;
3) Loss on sale of home in the approximate amount of $45,100;
4) Emotional damages suffered by Mr. Hollis and Mrs. Hollis in an amount to be determined by the jury; and
5) Emotional distress and injury to minor Plaintiffs caused by the delay in the ability to accommodate their physical, emotional, and environmental needs in an amount to be determined by the jury.

The Defendants' bald assertion that Plaintiffs' have suffered no damages is unsupported by the evidence.

## CONCLUSION

Based on the foregoing reasoning and authorities, the Defendants' Motion for Summary Judgment should be denied as a matter of law.

---

[12] Plaintiffs have estimated these costs at approximately $206,265.79.

Respectfully submitted,


/s/ Larry L. Crain
Larry L. Crain, Esq.
**Crain, Schuette & Associates**
5214 Maryland Way, Suite 402
Brentwood, TN 37027
Ph:   (615) 376-2600
Fax: (615) 345-6009
Larry@CSAFirm.com

-and-

/s/ Tracey McCartney
Tracey McCartney, Esq.
Tennessee Fair Housing Council
107 Music City Circle
Nashville, TN 37214
(615) 874-2344
*Attorneys for the Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2013, a copy of the foregoing Memorandum was served by first-class mail and e-mail to counsel for Defendants, at the following addresses:

Gary R. Wilkinson
LAW OFFICE OF GARY R. WILKINSON
51 Century Blvd., Suite 300
Nashville, TN 37214-3687
(615) 873-2868
wilking2@nationwide.com
*Attorney for Defendants*


/s/ Larry L. Crain