# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CHARLES M. HOLLIS, JR., and | ) | |
| MELANIE HOLLIS, Individually and | ) | |
| as Next Friends for H.H. and C.A.H., | ) | |
| two minors, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:12-cv-0137 |
| | ) | |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| CHESTNUT BEND HOMEOWNERS | ) | |
| ASSOCIATION and WESTWOOD PROPERTY | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

The defendant Chestnut Bend Homeowners Association (the "CBHA" or the "Association") has filed a Motion for Summary Judgment with a supporting memorandum (Docket Nos. 22-26), to which the plaintiffs have filed a Memorandum in Opposition (Docket No. 30). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND[1]

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed facts (Docket No. 26), the plaintiff's responses thereto (Docket No. 32), the exhibits filed in support of the plaintiff's response (Docket No. 31), the full deposition transcripts of Melanie Hollis, Charles M. Hollis, Mary Jean Turner, Robert Notestine, and Tracey McCartney (Docket Nos. 39-43), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

# I.       Overview

The CBHA is a non-profit corporation that serves as the governing body for the Chestnut Bend planned unit development in Franklin, Tennessee.  At all times relevant to this action, Plaintiffs Charles Hollis, Jr. ("CH") and Melanie Hollis ("MH") (together with CH and their minor children, the "Hollis Family") were members of the Association due to their ownership of a home in Chestnut Bend.

MH and CH lived at their home in Chestnut Bend with their five children—two teenage children and three minor children.  Two of the minor children, H.H. and C.A.H., are physically and mentally disabled.[2]  H.H. was born with congenital heart disease and Down Syndrome. C.A.H. was also born with Down Syndrome.  Although the caption of this action indicates that MH and CH bring this action individually and on behalf of H.H. and C.A.H. as next friends, the plaintiffs fail to distinguish their individual claims from their children's claims in both the Complaint and their briefs.  The plaintiffs also fail to demonstrate any individual standing that MH and CH may have in this matter as parents of H.H. and C.A.H., requiring dismissal of the parents' individual claims.  Therefore, for purposes of this Memorandum and the related Order, the court refers to the plaintiffs as the "Hollis Family" and evaluates only the children's claims under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA" or the "Act"), and thereby, MH's and CH's claims as next friends.

The CBHA is an organization of the homeowners within the Chestnut Bend community. Each housing unit has one vote and is permitted to participate and vote in monthly meetings.

---

[2] The parties do not dispute that H.H. and C.A.H. are considered disabled under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*  Nor do the parties dispute that MH and CH are entitled to bring suit on behalf of their minor children as next friends.

The CBHA is governed by a board (the "Board").  The Board is made up of five members of the Association and is responsible for appointing members of various committees, including the Architectural Review Committee (the "ARC").  The ARC has three members, none of which is a member of the Board.  The Board appoints one of its members to act as a liaison between the Board and the ARC.  The Board and the ARC are also responsible for administering the Declaration of Covenants, Conditions, and Restrictions (the "CCR") for Chestnut Bend.  The CCR for the Chestnut Bend Subdivision provides the following:

> 18. ARCHITECTURAL CONTROL. (i)   <u>Construction, Review and Approval.</u>
> From and after the date of recording of this Declaration in the Register's Office of Williamson County, Tennessee, no house, garage, play house, Satellite dish, Television, or radio receiving or transmitting device, outbuildings, pool, fence, wall or other above-ground structure or exterior improvement of any kind, type, or description, shall be commenced, erected or maintained above any Lot, nor shall any exterior addition to, change in or alteration of any said structure be made, until complete final plans and specifications showing the nature, kind, shape, height, materials, interior and exterior finishes, location and floor plan thereof, and showing front, side and rear elevations thereof and the name of the builder and general contractor performing such work have been submitted to and approved by the Developer prior to sale of all the Lots in the Subdivision, as may be expanded from time to time, or, after such time, by an architectural control committee composed of 3 or more persons appointed by the Developer, as to harmony of exterior design and general construction quality, and as to location in relation to surrounding structures and topography.  Any such plan or improvement outlined above shall be deemed approved if not acted upon by the Developer or its committee within thirty (30) days of submission.

(Docket No. 32 ¶¶ 1-4.)  The Chestnut Bend CCR was recorded in the Register's Office of Williamson County, Tennessee in 1997.  (*Id.*)

3

The CBHA employed Westwood Property Management ("Westwood") as the manager of its residential development.[3]  Westwood Property employed a property manager, Mary Jean Turner ("Turner"), who at relevant times to this action served as the manager of eight or nine communities with homeowners associations, including Chestnut Bend.  As property manager of Chestnut Bend, Turner was responsible for handling paperwork related to the community, attending the homeowners association meetings as an agent, and taking calls and complaints from residents.  Turner met monthly with the Board, corresponded regularly with the Board and its committees over email and telephone, and worked as a middleman between the Board and other homeowners for requests related to home maintenance, construction, and requests pursuant to the CCR.

## II.        The ARC Review Process, Generally

Regularly, Turner received applications from Chestnut Bend homeowners for approval of exterior changes to their homes, which are governed by Section 18 of the CCR.  These changes included requests for fences, porches, roof improvements, paint color changes, play houses, trampolines, and home additions.  Turner's job included examining the application for completeness and corresponding on behalf of the ARC with homeowners regarding their applications during the approval process.   Generally, the ARC and the Board permit residents to add exterior structures to their home when the structures meet the aesthetic and quality standards of the neighborhood as determined by the ARC, its guidelines, and the Board.  The ARC typically responded to Turner with an approval or denial.  In cases where the ARC denied an

---

[3] Westwood Property Management is a former defendant in this action.  Westwood was dismissed with prejudice on August 14, 2013 by voluntary non-monetary settlement and an agreed consent order.  (Docket Nos. 36 and 37.)

4

application, the ARC usually was not required to provide the rationale behind its decision. After the ARC made a decision, Turner notified the Board of the disposition and sent a form letter to the applicant reflecting the ARC's decision. The form letter did not set forth any procedure for appeal of the ARC's decision, but a homeowner could request that the Board review an ARC decision by requesting an audience at the next monthly Board meeting.

The required application for exterior changes is titled "APPLICATION FOR FENCE/STRUCTURE/EXTERIOR CHANGE – 080810" ("Form 080810"). The face of the application sets forth certain requirements that must be met before an application for exterior change will be approved by the ARC. It also directs applicants to review the CCR for additional elements that must be met to submit an application to the ARC. The requirements include, among others:

- Front and side view elevations with dimensions
- Location and depth of any required cuts or fills in the soil
- Show the location of any existing utilities or drainage courses (if applicable or in close proximity)
- Secure required permits from the city or utilities, as required.
- Structures must conform to building guidelines and applicable codes.

Additionally, in applications for room additions, a homeowner must submit "exterior elevations; a plot plan indicating property lines and building setbacks; a sample board of materials to be used; and color samples of paints and stains." For an application to be considered complete, the ARC required that a homeowner submit each of the listed requirements on Form 08010 and, sometimes, information also set forth by Section 18 of the CCR.

At the time of all events relevant to this action, Deborah Panaia ("Panaia"), Andrea Repass ("Repass"), and Bill Rosin ("Rosin") (together with Panaia and Repass, the "ARC

5

Members") were members of the ARC.  David Bradley ("Bradley") served as the Board's liaison to the ARC.

**III.** **The Hollis Family's Sunroom Proposals**

The plaintiffs contend that they submitted four separate applications for review by the ARC.  Each submission is discussed below.

**A. First Submission, the "Florida Sunroom"**

1. <u>Initial Application</u>

On March 15, 2011, Melanie Hollis emailed her friend, Panaia, to notify her that she and her husband were planning to add a sunroom onto their house because the awning on the back of their house had worn down as a result of winter weather conditions.  MH included measurements for the sunroom and a photograph of a proposed design, which was nearly all glass and metal to resemble a conservatory.  On March 16, 2011, MH dropped off Form 080810 at Panaia's home, leaving it in her mailbox.  The plaintiffs' submission lacked specifications showing the nature, kind, shape, height, materials, interior and exterior finishes, location and floor plan thereof, elevations, and the name of the builder and contractor who would perform the work.  The plaintiffs also failed to note the exterior elevations of the addition, a plot plan demarcating the Hollis's property lines and building setbacks, a sample board of materials, and color samples of paints and stains.  MH did not mention her children, H.H. and C.A.H., or their disabilities in her application form or her email to Panaia.

6

Panaia forwarded MH's email to Turner and the other ARC members on March 31, 2011, expressing her approval and remarking that she would mail the hardcopy application to Turner.[4] On April 12, 2011, Turner emailed the ARC members to request their votes on the Florida Sunroom proposal. Repass and Rosin expressed concern regarding the design of the addition, and in particular, its materials. Both requested further information, like a rendering, to make a decision. On April 14, 2011, Repass suggested that the Hollis's application should go to the Board for final say. She voted, along with Rosin, that she did not approve the design because of the aesthetics.

After the negative reception by the ARC, Panaia and Turner exchanged emails about how the plaintiffs' application would proceed. Turner alerted Panaia on April 15, 2011 that the Board had discussed the plaintiffs' application at its April meeting and determined that the present application did not contain enough information. Turner stated that she would explain to MH that the plaintiffs needed "to present [to the Board] a complete packet with dimensions, materials, [and a] plot plan indicating exact location."

### 2. Request for Further Information and Response

On April 19, 2011, Turner emailed the plaintiffs and requested "a more complete ARC application with diagrams, etc." because the ARC was "not on board with the metal framework." Turner included a formal letter requesting the required information for a new application. MH

---

[4] The record reflects disagreement over when the application was received by the ARC for purposes of the thirty (30) day review period described by Form 080810. For purposes of this motion, the court grants all favorable inferences to the non-moving party and thus assumes that the form was delivered to Panaia on March 16, 2011. But Form 080810 states on its face that requests for additions should be delivered to the property manager's office. Because the application was incomplete and delivered to the wrong party, the dispute regarding when the application was received by the ARC is irrelevant.

responded to Turner, copying the ARC and its Board liaison. She asserted that the ARC had failed to approve or deny the project within thirty days, as required by the CCR, and explained that she and CH were "contacting [their] attorney" to ask if the CCR did not bind the plaintiffs. MH also threatened that she and CH were "willing to fight for their sunroom."[5]

In response to the ARC's concern about the metal framework of the sunroom, MH mentioned her children and her desire to create "an outdoor room for our two little ones with Down syndrome," for which she preferred the metal framework. But, instead of indicating that her children's disabilities required that the ARC approve her application for a sunroom, she stated that she desired approval because "[t]he current tarp that was placed over our existing deck . . . is becoming more and more damaged with each storm."

### 3. The Board Meeting and Denial

On April 25, 2011, Rick Jagger, the plaintiffs' contractor for the Florida Sunroom, delivered a letter to Turner that included detailed information regarding the proposed addition and renderings of the design. Turner forwarded the information to the ARC on April 25, 2011, by email. Shortly after, the ARC began to comment. Repass voted against the sunroom design, as did Rosin. The ARC's decisions were solely based on aesthetic concerns, particularly the sunroom's failure to blend with the existing house and surrounding houses. Repass suggested that the Board look at the application because the ARC was inclined to decline approval. On April 27, 2011, Turner wrote a letter to the plaintiffs, explaining that the ARC had denied the request for approval because of aesthetic reasons. Turner's letter requested that the plaintiffs

---

[5] As of the time of the plaintiffs' first threat of litigation in April, they had not mentioned their disabled children or any relationship between the proposed addition and their children's needs.

resubmit an application because the ARC felt that the proposed materials did not appropriately align with the neighborhood "look."

On May 19, 2011, the CBHA met for a monthly meeting. Rick Jaggers attended the meeting on behalf of the plaintiffs. The Board discussed the Florida Sunroom design and decided to deny it for aesthetic reasons. The Board resolved to send the Hollis Family a letter asking that the family consider redesigning the sunroom with changes like stonework up the sides and a shingled roof. Turner emailed the plaintiffs a letter dated May 26, 2011, explaining the Board's position and promising that any resubmission would be given immediate attention.

### B. Second Submission, the "Siding and Shingles Proposal"

Melanie Hollis submitted a second request to Turner on August 8, 2011. Along with Form 080810, the plaintiffs attached a letter with a hand-drawn diagram of a sunroom addition. The letter stated that the addition will be "heated and cooled and have a fully shingled roof with matching shingles; in addition, gutters and siding will match existing." MH's August 8 submission did not include all of the information required by the CCR and Form 080810.

Turner responded the same day requesting additional information, including whether the materials would be painted, whether the contractor provided a drawing of the sunroom, and the height of the sunroom. MH replied quickly and mentioned that the room would sit approximately one foot from ground level "to give H.H. and C.A.H." ease for passing between the sunroom and the backyard. The next day, Turner forwarded the application to the ARC and included her email chain with MH, which included some of the additional information requested by Turner. Panaia responded to approve the addition but requested a drawing of the proposed addition. Repass indicated her aesthetic disagreement with the proposed siding and also asked for a drawing. MH provided another hand-drawing with front and side elevations on August 11,

9

2011.  The ARC conversed either in person or by phone and reached a consensus that, aesthetically, they did not approve of the Siding and Shingles Proposal unless the exterior was constructed of brick.  Repass communicated this decision to Turner on August 12, 2011, on the ARC email chain.  Turner then wrote to MH: "The ARC has taken a look at your application for a sunroom and are requesting that you use brick rather than siding on the exterior or [sic] your sunroom. Please let me know if you are willing to revise the exterior of your sunroom from siding to brick."

The plaintiffs responded three days later, expressing concern that they had been unable for years to find brick that matched their house.  MH wrote that she and her husband intended to appeal to the Board and that, if the Board did not grant approval to the Siding and Shingles Proposal, the plaintiffs would pursue court action against the CBHA to remedy the disagreement.[6]  Presumably after reviewing MH's August 16, 2011 email, Repass expressed to Turner the ARC's reluctance to permit an all-siding addition and stated that the ARC would send the Siding and Shingles Proposal to the Board.

To aid in a smooth approval process, Turner requested that the plaintiffs and their contractor meet with the Board.  She also asked that the plaintiffs consider a stone exterior rather than siding per the ARC's suggestion.  On behalf of the Board, Turner requested the plaintiffs' property plot plan, a professional drawing of the addition, and sample materials to be used on the proposed sunroom.  The plaintiffs promptly rejected a stone exterior as cost-prohibitive and refused to provide the additional information requested by the Board.  The plaintiffs were

---

[6] The plaintiffs did not mention the FHA or their disabled children when they threatened litigation on August 16, 2011.  (Docket No. 31 Ex. 36.)

particularly focused on whether other homeowners requesting approval from the Board had been required to provide complete applications. The plaintiffs also refused to meet with the Board.

The Board discussed the Siding and Shingles Proposal over email between August 21 and August 24, 2011. Several members of the Board argued that the requests for further information issued to the plaintiffs were not unreasonable, and even constituted less than what other homeowners were required to provide. The Board's president, Mike Vaughn, instructed Turner to "kick it back" to the plaintiffs and "tell them we need more." Vaughn also asked Turner to compile a notebook of past approved projects to help the Hollis Family prepare an appropriate application. Vaughn also suggested that the local high school's vocational department might help the plaintiffs with a professional drawing.[7]

On August 29, Turner wrote a letter to the Hollis Family, again requesting a complete application and explaining that the Board could not "approve the application as submitted." As Vaughn had suggested, Turner attached sample applications submitted by other homeowners to guide the plaintiffs' next application.[8] Turner's August 29 letter also included a list of the requirements that are set forth by Form 080810 and the CCR. Notwithstanding the Board's

---

[7] The plaintiffs complain in their opposition brief that, at the time the Board requested additional materials, they were already in possession of those materials from the Hollis Family's prior submissions. (Docket No. 30 at 10 n.6 and n.7.) But, although the plaintiffs had previously submitted some relevant information to Turner, they repeatedly failed to submit a complete application at one time for processing by the Board. Instead, the plaintiffs submitted their application piecemeal and appear to have expected Turner and the ARC to sort and gather the scraps of information sent by the plaintiffs to create a full application.

[8] Contrary to the plaintiffs' assertions, it appears to the court that the ARC and the Board did not delay in assessing the Hollis Family's applications and, in fact, tried to help the plaintiffs complete their application in accordance with the CCR and the Board's requirements.

11

requests, the plaintiffs did not submit any further information to supplement their Siding and Shingles Proposal.

**C. Third Submission, the "Clay Morgan Sunroom"**

    1. <u>The September 13 Email Application</u>

On September 13, 2011, Melanie Hollis sent an email to the ARC and the Board requesting permission from the ARC to build "an exact copy of Clay Morgan's sunroom." Clay Morgan is a Chestnut Bend homeowner and a former member of the ARC. The plaintiffs requested a slight variation on the existing Morgan sunroom—a change in color to the metal roof. MH then alerted Turner that the plaintiffs had turned in a copy of their plot plan a few years prior with an application for a fence and asked Turner to locate the plot plan in Westwood's records. MH included a builder's contact information and approximate dimensions of the addition, but she did not submit the additional information listed on Form 080810 and the CCR. The plaintiffs' teenage daughter delivered a hardcopy application to Turner. Two days later, the Board issued a denial by letter from Turner to the Hollis Family because the Clay Morgan Proposal did not include proposed elevations, dimensions, location and depth of any cuts in the soil, location of utilities or drainage courses, or a plot plan—all requirements listed by Form 080810 and the CCR.

    2. <u>Supplemental Emails for the Clay Morgan Sunroom</u>

MH replied by email to the ARC, the Board, and Turner on September 20, 2011. MH explained that she intended to "modify" her other requests with the Morgan Sunroom Proposal—not to begin a new application process. Although she was submitting a different design for the proposed addition, MH appears to have expected that the ARC and the Board would overlook the shortcomings in her application and simply fill in the blanks with information from her past

12

applications.  MH then complained that the Board seemed to be altering its focus from an aesthetics-based approval to other issues, including utilities, drain, and setback concerns.  She also protested the ARC's requirement that she provide photographs because she had suggested an exact replica of another homeowner's sunroom.  She submitted a plot plan with her reply and provided answers to the Board's questions about drainage, utility lines, and location and cut details for the soil.  Finally, she asserted that, although the plaintiffs had submitted three different designs, the general plan to "replac[e] an existing deck area . . . with extensions on each side" had been the same since the first application submitted in March.

MH explained (for the first time) that the "sole purpose [of the addition was] giving H.H. and C.A.H. needed safe play space with as many windows and screens as possible."  MH included information about H.H.'s heart condition and explained that the plaintiffs had been "battl[ing]" the ARC and the Board for approval in order to build a play space for H.H. and C.A.H.  After a lengthy explanation of her assertive nature as a person, MH notified the Board that "H.H. is limited by her activity level because of (1) her heart condition; (2) muscle tone that doesn't exist as a result of an extra chromosome; and (3) lack of balance resulting from the worst far-sightedness her eye doctor has ever seen."[9]  In closing, MH scolded the Board and the ARC for their "treatment toward [her] family and [their] callousness toward our H.H."  MH's September 20 email is the first indication in the record that the *purpose* of the sunroom was to aid her two disabled children and not to simply replace a damaged deck.

3.  MH's September 29 Follow-Up Email

---

[9] MH did not attach any supporting evidence about H.H.'s health conditions to her email. (Docket No. 31 Ex. 46.)

13

On September 29, 2011, MH sent a follow-up email to the ARC, the Board, and Turner to elaborate on the plaintiffs' newly announced purpose for the sunroom as a therapy room for H.H. and C.A.H. MH included details on therapy equipment for H.H. and C.A.H., specifically directing the ARC and the Board to a sales link for an indoor therapy gym. MH explained certain symptoms of H.H.'s disability and noted that the indoor therapy center would require "lots of space," and "preferably space that offers windows and screens." MH again lamented the Board and the ARC's slow responses and accused the Board and the ARC of "creatively continu[ing] to add to the list of items we have to check off before an approval 'might' be given."[10] In conclusion, she asserted that the sunroom addition was "necessary to give [H.H. an emotional] outlet."

### 4. September 30, 2011 Board Meeting

The Board discussed MH's September 20 and 29 emails at their September 30, 2011 meeting. Turner's handwritten notes indicate that the Board first learned about the plaintiffs' newly-stated intention for the sunroom's use from MH's September 20 and 29 emails. Turner's notes reflect a conclusion that decisions made by the Board and the ARC were based solely on the exterior of the structure meeting the standards set by the ARC and the Board, and not on its intended internal use.

### 5. October Communications

The Board and the ARC did not respond to MH's September 20 and 29 emails. On October 7, 2011, MH emailed Turner and the Board to request a reply. Turner responded on

---

[10] The list of items requested by the Board in response to the August and September applications matches the requirements listed by the CCR and Form 080810, both of which were available to the plaintiffs at the time of their initial application in March 2011.

14

October 7, 2011 to alert the plaintiffs that she had prepared a packet of information for them.[11] A few days later, MH emailed the Board, the ARC, and Turner a photograph of Clay Morgan's sunroom as an application, asserting that "our sunroom would be a replica with a brown metal roof with dimensions that were given in [sic] ARC application." Turner forwarded this information to the Board and the ARC and expressed frustration that the plaintiffs had again failed to submit a full application for evaluation. Vaughn suggested responding with gratitude but requesting the information required by the CCR and Form 080810. Turner sent a letter to the Hollis Family the next day, explaining that the Morgan sunroom pictured was in place prior to the Morgan Family purchasing their home and prior to the establishment of the ARC guidelines. Turner further noted that MH's "submission of this photo with no other information can not [sic] be processed as a complete ARC Application for approval" and reiterated her request for the information required by Form 080810 and the CCR.

MH responded with a lengthy email on October 12, 2011, reiterating the purpose for the sunroom and arguing that she had previously turned in all of the information required with past applications. MH's email complained that her application was 60 pages long because of the substantial information required by the ARC. She included quotes in her email from letters written by H.H.'s and C.A.H.'s physicians, explaining that the sunroom "would benefit the children and the entire family" and recommending that H.H. "is not to be physically constrained

---

[11] An October 10, 2011 letter from Turner to the Hollis Family indicates that Turner pulled copies of ARC applications from the plaintiffs' resident file to assist them in preparing a complete application. She also expressed the Board's desire to meet with the plaintiffs and their contractor once the plaintiffs had prepared all of the requested information.

or restrained as it may compromise her health status."[12] Finally, she also included a quote from regulations passed pursuant to the FHA and threatened legal action against the Board:

> Part 100—DISCRIMINATORY CONDUCT UNDER THE FAIR HOUSING ACT
> 100.204      Reasonable Accommodations.
> (a) It shall be unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling unit, including public and common use areas.

The October 12, 2011 email contains the first mention of the FHA in the plaintiffs' correspondence with the Board, and the first indication that the plaintiffs considered their sunroom addition application to be a request for reasonable modification under the FHA.[13]

### 6. Attorneys Become Involved

According to the record, the Board did not reply to the October 12, 2011 email. Around this time, attorneys became involved on both sides. The Hollis Family engaged Tracey McCartney, the Executive Director of the Tennessee Fair Housing Council. Turner reached out to Robert Notestine, an attorney that the CBHA had used for past legal matters like collections and civil warrant filings. (Docket No. 41 at 18.) As of the Board's meeting on October 28, 2011, the Board determined that all correspondence with the Hollis Family should go through Notestine to McCartney. (Docket No. 42 Ex. 7.) On October 31, 2011, Turner wrote a letter to Notestine detailing the requirements of applications by homeowners for additions in Chestnut

---

[12] The physicians' letters support a finding that a sunroom would benefit H.H. and C.A.H., but neither letter indicates that the doctors considered the sunroom to be a *necessary* modification for the children.

[13] It is notable that the Hollis Family first met with their attorney, Tracey McCartney of the Tennessee Fair Housing Council, on October 11, 2011—the day before MH sent an excerpt of regulations passed under the Act to the Board. (Docket No. 43 at 14.)

16

Bend. Notestine corresponded directly with McCartney in late October 2011 and early November regarding the Hollis Family's applications. (Docket No. 42 Exs. 8-10.) On November 5, 2011, Notestine informed McCartney that the Board had no complete application on file and required a full application in order to approve the addition.

### D. Fourth Submission, the "McCartney Proposal"

1. December 6, 2011 Application

On December 6, 2011, McCartney submitted an application via email to Turner and the ARC on behalf of the Hollis Family. She copied Notestine on the email. A cover letter written by McCartney requested that the ARC and Turner alert her immediately if the submission was considered incomplete. The application itself was thorough and included Form 080810, a plot plan, renderings illustrating elevations and dimensions, samples and photos of materials and features of the sunroom, and additional information to fulfill the requirements of Form 080810 and the CCR.

The design of the McCartney Proposal included windows matching the existing home; a brown metal roof; wood siding matching the home's trim; and faux stone on the lower portion of the exterior. McCartney also wrote a letter to Notestine outlining legal issues that she felt were pertinent to the Board's consideration of the application. McCartney's letter to Notestine included information about reasonable accommodations and reasonable modifications under the FHA, and it requested consideration within 14 days. McCartney also specifically articulated that the plaintiffs' addition "is to be a reasonable modification of the Hollis home under the federal Fair Housing Act" and asserted that the ARC's "discretion to reject their proposal on aesthetic grounds . . . is somewhat abrogated" by the Act. McCartney attached letters from Barbara Hargrove (a physical therapist) and Dr. Norman Albertson (a physician) and a Joint Statement of

17

the Department of Housing and Urban Development ("HUD") and the Department of Justice ("DOJ"), titled "Reasonable Modifications under the Fair Housing Act."

The ARC and the Board discussed the plaintiffs' request immediately. Repass quickly voted to approve the submission with one change: a shingled roof, which she considered consistent with the architectural standards of the neighborhood. She also wanted an assurance from the Hollis Family that the exercise equipment meant for the sunroom would remain indoors (instead of serving as an outdoor playhouse, which would require approval per the CCR). Repass's position quickly gained support from other members of the ARC and the Board, including Rosin, Erick Nash, David Bradley, Lisa Thomas, and Mike Vaughn. Some board members qualified their votes based on legal advice. Turner emailed the Board's consensus with the two proposed conditions to Notestine on December 9, 2011. Notestine promptly drafted a letter to the plaintiffs on behalf of the Board and the ARC, relaying its position. This letter was reviewed and approved by the ARC and the Board before it was sent. The Board's December 13, 2011 meeting minutes indicate that the Board had approved the McCartney Proposal. The minutes state that "Bob Notestine has sent the letter of approval, with request for consideration of a shingled roof onto [sic] Tracey McCartney of the Fair Housing Administration." (Docket No. 42 Ex. 19.)

Around early December 2011, the plaintiffs found and decided to purchase a new home in a different neighborhood.[14] (Docket No. 39 at 38-39.) At some point after the plaintiffs had

---

[14] The plaintiffs moved into a new home on Kinnard Springs Road in Franklin, TN in March 2012. Charles Hollis testified that they moved because they felt "forced out of their home" in Chestnut Bend. (Docket No. 40 at 25.) This move is the basis for the plaintiffs' monetary damages claims in the amount of about $300,000. The plaintiffs claim that, as a result of the move, they lost $206,265.79 in improvements that they had already made to their Chestnut

18

submitted their first application for a sunroom, they began searching for a new home because the Board did not quickly approve their initial application.  (*Id.*)

### 2.  The December 15, 2011 Letter

Notestine's letter informed the plaintiffs that the ARC had reviewed the McCartney Proposal and "generally found it to be acceptable."  He wrote, "The subdivision standard roof is shingle and not metal," and although the ARC "recognize[s] the Morgan sunroom addition has a metal roof, this structure was built before the [ARC guidelines] were established."  He also requested "assurance in writing that the exercise equipment would be placed and maintained in the sunroom and not moved outside without further application to the ARC."  The letter noted that the latter request was "a condition of approval."  He concluded the letter: "Please review these comments and advise if your client would agree to the above two requests by the ARC.  If so, I would suspect that approval will be forthcoming."

### 3.  The Plaintiffs' Counter Offer

That same day, McCartney responded to Notestine's letter.  McCartney replied that her clients would consider the shingled roof option, but were leaning towards a metal roof and directed Notestine to a letter sent by Turner to the Hollis Family on October 31, 2011, indicating that a metal roof was permissible under the ARC guidelines.  She then inquired whether the

---

Bend home, including nearly ten thousand dollars spent on "Personal Touch Ceramic Tile," tens of thousands of dollars in landscaping fees (including what appears to be nearly $50,000 in landscaping fees over an eight-month period in 2009 alone), a dishwasher worth over one thousand dollars, and nearly thirteen thousand dollars spent on hardwood flooring.  (Docket No. 39 at 141-147.)  The plaintiffs also claim a loss of $45,100—the difference between the purchase price of their home in 2006 and the sale of their home in 2012.  The plaintiffs also seek recovery of damages from the defendant related to "emotional upheaval" suffered by H.H., C.A.H., MH, and CH.  (Docket No. 30 at 24.)

19

application would be approved so long as the Hollis Family did not leave play equipment outdoors for a period of time longer than an afternoon. (Docket No. 42 Ex. 16.) Notestine immediately forwarded McCartney's response to Turner, who passed it along to the Board. (*Id.* Exs. 17, 22.) A board member, Lisa Thomas, responded the same day. "We said it in writing so we honor it. Our request for alternate roofing has been acknowledged; perhaps they will come through on it." Notestine did not act on Thomas's response.

The next day, McCartney followed up with another letter to Notestine. She wrote that (1) the Hollis Family would be moving forward with a metal roof, which was acceptable per Turner's October 31, 2011 letter and the CCR, and (2) that the Hollis Family would provide an assurance regarding the play equipment upon demonstration that similar assurances were required of other homeowners asking for additions. McCartney's December 16, 2011 letter requested a response by close of business on December 22, 2011. (*Id.* Ex. 18.)

No one responded to McCartney's December 16, 2011 letter before the December 22, 2011 deadline. On January 13, 2012, the Board approved its December 13, 2011 meeting minutes, which reflected the Board's approval of the McCartney Proposal.

The Board and the ARC did not learn of McCartney's December 16, 2011 letter until a month later, when Notestine forwarded the letter to Turner, explaining that he had somehow missed the communication. On January 16, 2012, Notestine replied to McCartney:

> I obviously was unable to get back to you by December 22, 2011.
> The end of the year was particularly hectic for me (as was the start
> of this year). You stated in your letter that your clients would
> proceed 'with available legal options.' What options have your
> clients decided to pursue?

Notestine answered McCartney's inquiry regarding the therapy equipment, explaining that the Board did not have precedent on the therapy equipment issue because it had not been raised by

20

other applicants.  (Docket No. 42 Ex. 20.)  Notestine copied Turner on his January 16, 2012

email to McCartney.  The next day Turner responded, confused about whether the plaintiffs had

submitted an additional change to their application.  Notestine explained that the plaintiffs were

moving forward with a metal roof and had refused to provide assurance regarding the equipment,

absent confirmation that other homeowners had been required to provide the same.

### III.      The Action

The plaintiffs filed the Complaint against the defendant and Westwood on February 2,

2012.  (Docket No. 1.)  The defendant and Westwood answered the Complaint on March 13,

2012.  (Docket No. 10.)  The parties attempted mediation with Magistrate Judge Griffin in May

2013 but were unable to reach settlement.  (Docket No. 21.)  On June 26, 2013, the CBHA and

Westwood filed this Motion for Summary Judgment.  (Docket No. 22.)  The plaintiffs responded

on July 29, 2013.  (Docket No. 30.)  On August 14, 2013, the court approved a settlement

agreement between Westwood and the plaintiffs and dismissed Westwood by agreed consent

order.  (Docket No. 37.)  For the reasons discussed below, the defendant's Motion for Summary

Judgment will be granted.

### ANALYSIS

### I.      Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue

of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the

plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that

there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th

Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     The Defendant's Motion

The CBHA contends that it is entitled to summary judgment on all of the claims asserted in the plaintiffs' Complaint. (Docket Nos. 22-23.) Specifically, the defendant argues that the plaintiffs' reasonable modification and accommodation claims should be dismissed because the plaintiffs do not demonstrate all necessary elements of their claims under the Fair Housing Act. Before turning to the merits of the defendant's motion, the court will briefly discuss the federal statute under which the plaintiffs have asserted their claims.

## III.     The Fair Housing Act

The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, as amended by the Fair Housing Amendments Act of 1988, prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). Courts have

22

recognized three distinct categories of FHA discrimination claims: (1) disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. Here, the plaintiffs' claims fall under the third category.

### A. Section 3604(f)(3)

Discrimination under the Act includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises." 42 U.S.C. § 3604(f)(3)(A). The statute also makes unlawful any "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3605(f)(3)(B).

A "modification" under the FHA is distinct from an accommodation. *See Weiss v. 2100 Condominium Ass'n, Inc.*, --- F. Supp. 2d ---, 2013 WL 1767974, at *6 (S.D. Fla. Apr. 8, 2013); *see also* 24 C.F.R. § 100.203; Joint Statement of HUD and DOJ, *Reasonable Modifications under the Fair Housing Act* ( Docket No. 31 Ex. 69) ("Joint Statement"). The Act does not provide a definition for "modification," but regulations promulgated by HUD define a modification as "any change to the public or common use areas of a building or any change to a dwelling unit." 24 C.F.R. § 100.201. Claims for reconstruction or renovation to a dwelling are actionable under the reasonable modifications section of the FHA, and not the reasonable accommodation section. *See Weiss*, 2013 WL 1767974, at *6; *see also Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249, 259 (E.D.N.Y. 2009); Joint Statement at 3, 6.

The plaintiffs argue that their requests for approval of a sunroom addition to their home were requests for reasonable modifications under Section 3604(f)(3)(A) and urge the court to

23

assess their claims accordingly. The plaintiffs further assert that, where their claims may be construed as requests for reasonable accommodations under the Act, the defendant's refusal to approve the plaintiffs' preferred sunroom design is a violation of Section 3604(f)(3)(B). The plaintiffs contend that the ARC denied four such requests for modification: the Florida Sunroom, the Siding and Shingles Proposal, the Clay Morgan Sunroom, and the McCartney Proposal.

The plaintiffs' claims are to be analyzed using the three-part evidentiary standard set forth by the Supreme Court for employment discrimination cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Lindsay v. Yates*, 578 F.3d 407, 414-15 (6th Cir. 2009); *see also Mencer v. Princeton Sq. Apartments,* 228 F.3d 631, 634 (6th Cir. 2000) (analysis applied to federal fair housing discrimination claims "turns on the three-part evidentiary standard first developed" by *McDonnell Douglas*). At the summary judgment phase, the burden shifting scheme requires that the plaintiffs present evidence from which a reasonable jury could conclude that there exists a *prima facie* case of discrimination. *See Lindsay*, 578 F.3d at 414-15; *Mencer,* 228 F.3d at 634. If the plaintiffs are successful, the burden shifts to the defendant to offer "evidence of a legitimate, nondiscriminatory reason for" the adverse housing decision. *Lindsay*, 578 F.3d at 414-15; *see Mencer,* 228 F.3d at 634. If the defendant carries its burden, the burden shifts back to the plaintiffs to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination." *Lindsay*, 578 F.3d at 415; *Mencer,* 228 F.3d at 634.

IV.     **The Plaintiffs' Requests for Reasonable Modification**

24

The plaintiffs claim to have submitted four requests for reasonable modification, but the record only supports the existence of one. The Joint Statement[15] makes clear that, "[u]nder the Act, a resident or an applicant for housing makes a reasonable modification request whenever she *makes it clear* to the housing provider that she is requesting permission to make a structural change to the premises *because of her disability*." Joint Statement at 9 (emphases added). "She should explain that she has a disability, if not readily apparent or not known to the housing provider, the type of modification she is requesting, and the relationship between the requested modification and her disability." *Id.* The requester need not mention the Act or use the words "reasonable modification," but "the request must be made in a manner that a reasonable person would understand to be a request for permission to make a structural change because of a disability." *Id.*

The plaintiffs heavily rely on the Joint Statement to distinguish their claim as a request for a modification rather than a request for an accommodation under the FHA. (Docket No. 30 at 14.) But by the Joint Statement's terms, the plaintiffs fail to show that, prior to MH's September 29, 2011 email, they (i) explained H.H. and C.A.H.'s disabilities to the Board; (ii) described the type of modification requested; and (iii) articulated the nexus between the children's disabilities and the requested sunroom addition.

The plaintiffs' first request focused on the deck they wished to replace, which was becoming an "eye-sore." The second application similarly failed to mention any relationship

---

[15] The Sixth Circuit discussed a Joint Statement related to Section 3604(f) issued by HUD and the DOJ in *Overlook Mut. Homes v. Spencer*: "This document is a policy statement, not an authoritative interpretation of § 3604. It may of course, have the 'power to persuade.'" *Overlook*, 415 Fed. App'x 617, 621 n.3 (6th Cir. 2011) (citing *Christensen v. Harris Cnty.,* 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law[,] do not warrant *Chevron*-style deference.")). Here, the court finds the Joint Statement persuasive.

25

between the plaintiffs' handicaps and the proposed addition. And the Clay Morgan Proposal also failed to place the Board on notice that the proposed addition was intended as a reasonable modification to help H.H. and C.A.H. by providing necessary space for indoor therapy.[16]

As to the first three requests by the plaintiffs, all submitted prior to the September 29, 2011 email, the defendant is entitled to summary judgment. Hereafter, the court's analysis is limited to the McCartney Proposal, the plaintiffs' fourth submission—and only request for reasonable modification—submitted to the ARC and the Board on December 6, 2011.

**A. Prima Facie Case**

Although the Complaint alleges disparate impact claims and claims for failure to provide reasonable accommodation and reasonable modification, the plaintiffs argue in their opposition brief that their claims should be construed as requests for reasonable modification and thereby waive their additional claims.[17]

1. The Appropriate Test for the Plaintiffs' Claims

The parties are in dispute as to the appropriate standard for a *prima facie* case for the plaintiffs' claims. The defendant asserts that the correct test is a five-prong test set forth by *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 855 (S.D. Ohio 2009), *aff'd*, 415 F.3d 617 (6th Cir. 2011). *Overlook* involved a parent's request that a mutual housing

---

[16] Although MH testified at her deposition that her first application to the ARC in March 2011 was based on a physical therapist's recommendation that the plaintiffs provide H.H. and C.A.H. space to give "[H.H.] an escape," the plaintiffs did not mention therapy equipment or the use of the sunroom as a therapy room for H.H. and C.A.H. until September 29, 2011. (Docket No. 39 at 27-28.)

[17] The court considers the disparate impact claim to be waived because it is not briefed by either party.

corporation grant an exception to its "no-pet rule" so that her emotionally disabled child could keep an "emotional support" animal.  The court concluded:

> To prevail on a claim under 42 U.S.C. § 3604(f)(3), a plaintiff must prove all of the following elements: (1) that the plaintiff or his associate is handicapped within the meaning of 42 U.S.C. § 3602(h); (2) that the defendant knew or should reasonably be expected to know of the handicap; (3) that accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation is reasonable; and (5) that defendant refused to make the requested accommodation.

*Overlook*, 666 F. Supp. 2d at 855 (quoting *DuBois v. Assoc. of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006), *cert. denied*, 549 U.S. 1216 (2007)).  The *Overlook* court also noted that the Sixth Circuit requires that an accommodation must be *necessary*, so the third prong may well read that the accommodation of the handicap *is* necessary.  666 F. Supp. 2d at 856 (citing *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002)); *see also Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039 (6th Cir. 2001) (under the Act, plaintiffs have the burden of proving that a proposed accommodation is reasonable and necessary).  The defendant argues that the plaintiffs fail to demonstrate the third and fifth elements of their claim.  The defendant claims that (1) the plaintiffs did not meet their burden of proving that the proposed accommodation was reasonable and necessary, and (2) the December 15, 2011 letter from Notestine to McCartney cannot be construed as a denial and, therefore, plaintiffs do not demonstrate that the CBHA refused to make an accommodation. (Docket No. 23 at 9-12.)

The plaintiffs disagree with the defendant and ask the court to apply a four-pronged standard set forth by an administrative law judge in a 2001 action brought by the Secretary of HUD.  In *Twinbrook Village Apartments, et al.*, an administrative law judge articulated a slightly

27

different test when she analyzed FHA claims asserted by disabled tenants requesting modifications to their rental properties. HUDALJ Nos. 02-00-0256-8, 02-00-0257-8, 02-00-0258-8 (Dep't of Housing and Urban Development Nov. 9, 2011) (O'Bryant, A.L.J.). The ALJ's test, which by its plain language is limited to challenges by rental tenants against landlords, eliminates the fourth prong of the reasonable accommodation test—the requirement that a plaintiff demonstrate that an accommodation is reasonable.[18]

The *Twinbrook* test does not apply here. Although the ALJ cited decisions issued by the Second and Ninth Circuits, neither court had employed Judge O'Bryant's unique four-prong test for reasonable modifications and, in fact, both cases addressed reasonable accommodations under the Act—not reasonable modifications. *See Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332-36 (2d Cir. 1995) (affirming grant of injunction to disabled plaintiff asserting violation of FHA after landlord refused to adjust its policies to assign her a parking space); *United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997) (assessing mobile home tenant's challenge to trailer park's fee requirements for overnight guests on the basis that plaintiff's daughter was handicapped and required in-home caretaker). The plaintiffs have not cited any other legal authority to support this four-pronged approach and contend that the court

---

[18] Judge O'Bryant wrote: "To establish a *prima facie* claim of discrimination in a rental unit under Section 3604(f)(3)(A) of the Act, a complaining tenant has to show that she sought the landlord's permission to modify the premises to accommodate her disability at no expense to the landlord, and (1) that the tenant is a person with a 'handicap' as that term is defined in section 3602(h) of the FHA; (2) that respondents knew or should have known that the tenant has a handicap; (3) that reasonable modifications may be necessary to afford the tenant full enjoyment of the premises (i.e., to have entry and egress from the apartment without significant difficulty); and (4) that respondents refused to permit such reasonable modifications." *Twinbrook Vill. Apartments* at 16.

should not require the plaintiffs to demonstrate the reasonableness of their requested modification.  (Docket No. 30 at 19-22.)

For purposes of the plaintiffs' claims here, the court finds that the distinction between the two tests is without a difference.  As set forth in the next section, even under the more stringent five-prong test, the plaintiffs have established a *prima facie* case of discrimination.

### 2.   The Plaintiffs' Fourth Submission

The plaintiffs' claim as to their fourth ARC application, the McCartney Proposal, sets forth a *prima facie* case of discrimination under the FHA.  The parties do not dispute that, on December 6, 2011, the plaintiffs submitted a complete application to the ARC and the Board. (Docket No. 32 ¶ 30.)  The application made clear that H.H. and C.A.H. are disabled and that the sunroom addition was intended as a necessary modification to the home in order to enhance the quality of life of H.H. and C.A.H.  The parties dispute the third and fifth elements of the claim— whether or not the Board denied the application, and also whether or not the sunroom addition was a "reasonable" modification.  (Docket No. 32 ¶¶ 21-23.)

The defendant contends that the Board approved the McCartney Proposal at its December 13, 2011 meeting, and the record suggests that the Board indeed discussed the application and granted approval.  But the record also indicates that Notestine, the Board's attorney, failed to communicate anything beyond conditional approval to the plaintiffs.  Notestine's December 15, 2011 letter clearly stated that *if* the plaintiffs "would agree to the above two requests by the ARC," Notestine "suspect[ed] that approval will be forthcoming."  (Docket No. 31 Ex. 63.) Whether or not the Board considered the application approved is irrelevant because the plaintiffs did not receive full approval for their December 6, 2011 request for a reasonable modification.

29

Additionally, the modification could be found by a fact-finder to be reasonable. The plaintiffs, at their own expense, wanted to build an addition meant to provide sensory stimulation to their disabled children and to provide space for therapy in conjunction with the sensory stimulation. Viewing the facts in the light most favorable to the non-movant, the plaintiffs have demonstrated a *prima facie* case of discrimination under the Act.

### B. Legitimate, Non-Discriminatory Reason

If the plaintiffs have satisfied their burden of establishing a *prima facie* case of handicap discrimination, the burden shifts to the CBHA to proffer a legitimate, non-discriminatory reason for the action taken. The defendant maintains that, in accordance with the CCR, it was exercising its obligation to maintain a "certain standard of the properties in the neighborhood" and its obligation to other homeowners in the CBHA "so as not to devalue the other homes in the community by allowing construction and additions that are not consistent with those standards." (Docket No. 23 at 14.)

It is undisputed that the plaintiffs were aware of the CCR when they moved into their home in Chestnut Bend. The plaintiffs fail to point to any precedent for ARC approval of a sunroom design similar to their proposal. Moreover, the record is replete with evidence demonstrating the defendant's sole focus on the aesthetic design of the addition, the materials to be used, and the design's potential impact on the value and architectural standards of neighboring homes. (Docket No. 30 at 15.) The court finds that the defendant has satisfied its burden of proffering a legitimate, non-discriminatory reason for denying the McCartney Proposal.

30

## C. Pretext

The burden therefore shifts back to the plaintiffs to establish, by a preponderance of the evidence, that the defendant's proferred reason is pretextual or unworthy of belief. *See, e.g.*, *Lindsay*, 578 F.3d at 418-20; *Choices in Cmty. Living, Inc. v. Petkus*, No. 3:11-cv-19, 2012 WL 1122368 (S.D. Ohio Apr. 3, 2012), *aff'd*, No. 12-3523, 2013 WL 114972 (6th Cir. Mar. 21, 2013). The evidence presented is insufficient to create a genuine issue of material fact such that a reasonable fact-finder could find in the plaintiffs' favor with respect to the question of pretext.

Even viewing the evidence in the light most favorable to the plaintiffs, the Hollis Family has failed to produce anything—not even a scintilla of evidence—to suggest that the CBHA's aesthetic reasons for rejecting the McCartney Proposal were pretextual or unworthy of belief. Indeed, the plaintiffs' opposition brief fails to address the issue of pretext, perhaps because the record is so devoid of any evidence to support it. On the contrary, the record contains an abundance of communications among members of the ARC and the Board related solely to the issue of the aesthetic design of the plaintiffs' submission. As the plaintiffs complain, yes—the ARC was fastidious as to its design preferences for the neighborhood. But the defendant's persnickety approval process alone is not a violation of the FHA, and the record overwhelmingly supports the defendant's legitimate and non-discriminatory purpose for denying the plaintiffs' McCartney Proposal.[19] The plaintiffs have failed to point to an occasion where the ARC was not concerned with the aesthetics of a homeowners' application for a sunroom, and MH and CH both

---

[19] The plaintiffs' testimony related to ill-will against their disabled children is limited to their former neighbors, the Stoehers. By the plaintiffs' own admission, the Stoehers did not serve on the ARC or the Board and were not involved in the application process. (Docket No. 39 at 52-53; Docket No. 40 at 51-58.)

testified about their past experiences with the ARC's rigorous approval process. (Docket No. 39 at 114; Docket No. 40 at 31-33.) Finally, the plaintiffs have not presented a shred of evidence that the ARC's review process changed after the defendant learned that the sunroom addition was intended as a reasonable modification for children with disabilities. The plaintiffs do not adduce any evidence showing that the defendant's non-retaliatory reason for denying the McCartney Proposal was pretextual.

Accordingly, for the foregoing reasons, summary judgment will be granted to the defendant with respect to the plaintiffs' FHA claims.

## CONCLUSION

For the reasons discussed herein, the Defendant's Motion for Summary Judgment will be **GRANTED**.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge